May it please the Court, I'm Barbara Axelrod and I represent the appellant M.G. and also M.G.'s cross appellee in this matter. I'd like to reserve four minutes for rebuttal. With respect to the primary issue, the lack of informed consent claim, what occurred in this case was that the parents really were hoodwinked. They thought their daughter was going to have a fontan completion done by surgery. They show up for it and they're told after the fact, oh no, we repaired a leaky valve and by the way, we've changed our minds. Now we're going to instead do something in the catheter lab. And the doctors presented it as if it were the simplest, easiest thing. They do it all the time. This is now the way we do it. Nothing to choose between, nothing to decide. Your daughter's just going to have this catheterization. And they were given the upside of it. They were told it's wonderful. She won't need open heart surgery. There's a quick and easy recovery. Isn't it great? But what they weren't told was the truth. Can I ask you something, Ms. Axelrod? Yes, sir. Assuming that everything you've said is 100% accurate in terms of them not being told what they should have been told, I'm interested in you talking to the causation issue, which was a challenge for the district court. There's a requirement under Delaware law that there be expert testimony to support each element of your informed consent claim, right? That's correct. Okay. Where is your expert testimony to support the assertion that had there been informed consent, the outcome with respect to the side effects, the lung injury, the heart failure, the lung issue, and the protein issue, would have been different with the surgical completion as opposed to the catheterization completion? That really wasn't the issue. And I think that's where the district court got off track. Because the experts, I think, all agreed that there's always a risk that the kids who go through fontan completion will develop protein-losing enteropathy and these other complications. The real problem was what happens when they do, and how are you going to address it. And what our experts said is that these are inherent risks of the surgery, but when you have this CP stent, there's serious problems trying to relieve these complications. And that was the injury that this child suffered. That speaks to your medical monitoring claim, but I guess on the informed consent claim, the question is, how are you meeting the negligence standard, which appears to be the standard that Delaware law requires? Well because our expert said, when she developed these complications, she needed repeat surgeries to correct the complications, because this stent was never meant to be corrected in this way. In other words, the way they relieve the complications is they poke holes in the conduit to relieve the pressure. But this, and normally, there's testimony from Dr. Norwood that when they did the surgical fontan, they would put in an intracardiac baffle, and they had holes poked in it, so you didn't have this problem of needing fenestration surgeries. That's the very point. You say she wouldn't have needed the fenestration surgeries. Where's your expert testimony to the effect that whether she had had a foreign object placed in her correction or with the catheterization, either way, fenestration issues would have come up? That's the defense side of it. Where's your expert testimony that says, no, they wouldn't have? Well our expert stated in his report that she had two fenestration surgeries to relieve these complications as a result of having the CP stent implanted. There's not a great deal of detail. It's true he doesn't go into a lengthy dissertation about what would have happened had she had the surgical method. However, I think a lot of that actually came out through the testimony of Dr. Norwood, where he said that in the surgical method, they use an intracardiac baffle that already has the holes poked in it, so you don't have this problem. But in our case, this child was given a stent that wasn't meant to have holes poked in it. And when the pressures build up and they had to poke the holes in, and that came out through Dr. Rome and a number of other, and their own defense expert, Dr. Jacobs, there was no choice. When the pressures build up and she developed these complications, they had to poke holes in the stent. And the stent was covered with Gore-Tex so that the holes closed over. And in fact, it was never meant to be fenestrated. It was never meant to have these holes poked in it. The designer, the manufacturer all testified to that. They also said, in fact, that this would not be a good thing if you had to poke holes in it because you're later going to have to expand the stent when she gets older and the heart and the blood vessels grow. There won't be enough blood flow to the heart. And if you've already got holes, it's going to be worse for this kid. Can you give us, though, the page in the appendix where the expert testifies as to the, this is what happened, and had there been informed consent, this would never have happened because she never would have had to have a stent anyway. Where in the record does Dr. Grossfeld testify as to exactly what's caused here? I think it's fair to say that he says, that's what he says in his report, that she had these fenestration procedures. In terms of the deposition, he was never asked. I'm just saying where in the appendix, appendix references. Okay. I'm talking about his report when he says... Where is that in the appendix? I'll find the page. It is attached to the appendix. Excuse me. We're talking about page 432 in his report where it says, M.G. has already had two additional procedures to fenestrate the stent, which was never meant to be fenestrated. But has he said that had they done the second catheterization, whatever they should have done, the phantom... The surgical completion. Surgical completion. Thank you. There's no way she ever would have needed a stent? There's not that much detail. And Delaware says you don't need it. Delaware says you just have to identify injury that was caused to this child and... She needs but four. Yes, but Delaware says we don't need magic words. We don't need a lot of detail. We just need an identification of a harm that she suffered. Don't you need enough detail to show that if it had gone another way, you'd have had a different outcome? So Dr. Grossfield doesn't say anything about what would have been used in a surgical completion, does he? No, I think it's the fair implication of what he's saying. When he criticizes the stent and says she's had two additional procedures, he's basically saying she wouldn't have needed them. He doesn't use those words. He doesn't give a lot of detail. And then the problem was when he was... That's the point. Don't you have to have an expert witness to come in and say, look, if but four, Drs. Murphy and Norwood doing what they did, this is what would have happened. And the consequence of this other thing happening are materially different than what actually happened. Yes, and I think... Also, where in the record is there testimony from Dr. Grossfield or any other medical person you want to point to who says that if she hadn't had a surgical completion, that there would not have been a need for fenestration associated with foreign objects placed in her heart in order to repair the congenital defects she had. That's the... Maybe I misunderstood what the district court was getting at, but I kind of understood that to be the problem, and that's what I'm trying to get you to speak to. No, the district court's problem was they only... The district court focused on, well, he says she developed these complications, and that's not an injury because he says that if these complications like protein losing enteropathy are inherent... Maybe I was implying it. Sorry. So he really ignored what the expert had to say when the expert said she's had additional fenestration procedures. In terms of deposition testimony, the expert was never asked that. He was deposed, and the defense was very careful. They simply asked him, well, what about these complications, the protein losing enteropathy? Aren't they inherent complications of the procedure? He said yes, but when it came to his statements about she's had additional fenestration procedures, they avoided that like the plague. So they never asked him during deposition, tell us about these fenestration procedures. Tell us whether if she had had these standard surgical procedures, she wouldn't have needed them. They were careful not to ask any of those questions because I think they knew what the answer would have been. It's your burden though, right? Well, here's the issue. We're equating the fenestrations done as they happened with the fenestrations that the other side said would have happened anyway. So we're looking at that and we're saying, well, geez, there were fenestrations in either circumstance. So maybe it would be helpful for you to tell us what other injury, as you describe it, has occurred as a result of the procedures that she endured so that in reviewing the fenestration procedures, it would be helpful for you to tell us what happened then. Well, I think the primary present injury was the fenestration procedures. I think it also came in through the testimony of Dr. Norwood when he talked about, he compared patients who had surgical baffling of the inferior vena cava with patients who had the CP stent. And he explained that the standard procedure that was most commonly performed is the surgical baffling and when they put the baffling, it's already fenestrated. So basically he was saying she would have had a fenestrated vehicle in there and we wouldn't be back with these multiple fenestration surgeries if she'd had the standard surgical procedure instead of having this stent implanted in her. You also had testimony from... Is there evidence in the record that there is no way she ever would have needed a stent, that the stent was totally unnecessary? She needed some form of medical correction. I don't think you can say that she needed no correction at all, but yes, it certainly didn't have to be the stent. The alternative, which the parents weren't told about, was to do the standard surgical procedure where you wouldn't have implanted the stent. You would instead have had open heart surgery and put in an intracardiac baffle. You would have put some foreign object. It required the insertion of a foreign object, right? Right, but the baffle would have been fenestrated already, so you wouldn't have had these problems with needing multiple fenestration surgeries. That's what we don't have the evidence for. You just put your finger on it. How do we know it wouldn't have had that problem? Who in the record tells us that fenestration is not a problem when you have this problem? Being done with a pre-punctured Gore-Tex tube, that's what we're asking you to point us to. Well, Dr. Hillwood on page 65 talks about the other baffles that we put in fenestrated, so he was saying that the intracardiac baffle is put in fenestrated versus this tube, which was never meant to be fenestrated, wasn't put in fenestrated, the CP stent, and had to be fenestrated after the fact. So the assumption you're making and asking us to make without medical evidence is that if you put a pre-fenestrated Gore-Tex tube in, that the problem that causes Gore-Tex to cover up like it did in MG's case doesn't happen with a pre-fenestrated Gore-Tex tube. We're not talking about a pre-fenestrated Gore-Tex tube. We're talking about the intracardiac baffle, because that was what they most commonly used during the surgery on these young babies. And in fact, that was the testimony, that that was the most commonly used thing, a lateral shunt, an intracardiac baffle. I should not have said tube, same baffle. The tube is different. On older patients, they did sometimes use an extracardiac Gore-Tex tube, but that's outside of the heart where you don't have the same pressures. My apologies. Say baffle. My question to you remains, what is the evidence of record that we could rely on to say there's medical testimony that shows a pre-fenestrated baffle will not have the complications requiring subsequent surgical intervention to deal with clogging or whatever else would require fenestration, as opposed to this, what happened here? I think it's more that that was a non-issue. We had no testimony from any of the doctors that if she'd had an intracardiac baffle, that that wouldn't have worked, that that requires multiple fenestration procedures. That simply was a non-issue, because you put it in and you're done. There was no, there was not even an issue that you would have to go back and keep correcting the baffle. That's very different from this CP stent that was put in her heart. We have, you have used your time, you have reserved four minutes for rebuttal. I'm going to take you down to three minutes and ask you to address the medical monitoring claim for two minutes now. Now? Yes. Okay. I don't want you to do that on rebuttal, because we want your opposing counsel to be able to talk to what you have said about the medical monitoring. Oh, they're the appellants on the medical monitoring issue. I'm the cross appellee on that. Oh, okay. Absolutely. Yes, you're right. All right. Well, then we'll hear from you on rebuttal. Okay. Thank you. Thank you. Thank you. May it please the Court, I'm Sarah Lynn Petrosky and I represent the physician defendants as well as their employer, the Nemours Foundation. I have the privilege of dividing my time with Mr. Cregan. I am planning to address the informed consent claim and one medical issue related to the medical monitoring as well as the Court's request to discuss certification to Delaware. I'll pick up where the Court left off with plaintiff's counsel. There is nothing in the record that suggests that this patient would not have needed or would not have wanted or her parents would not have consented to fenestration had she had a surgical fontan completion rather than a catheterization fontan completion using a stent. How about the assertion that it's pre-fenestrated and so that wouldn't have caused a problem the way this designed, never designed to be punctured was going to require? The problem with lawyers arguing medical cases is sometimes they stand here and try to practice medicine and I don't wish to accuse plaintiff's counsel of intending to mislead the Court. So I found the reference from Dr. Norwood's testimony where he talked about whether he would read that instead. Dr. Norwood was, it's 1164A of the appendix. Dr. Norwood was asked by plaintiff's counsel, and what's the purpose of fenestration even if you don't agree with it? That alludes to a former question, a page that wasn't provided by the plaintiff's counsel in the supplemental appendix where Dr. Norwood said he doesn't fenestrate. What page is that? It's not part of the supplemental appendix. We moved to strike. What happened was it wasn't included in the supplemental and it was included in a reply brief beyond the time that we had to respond. So we then moved one of the many motions that we filed was to move to strike this reference. So I don't have the page. I believe it's a page or two before this in the deposition, but there will be no appendix reference for you to look at. The question was, and what's the purpose of fenestration even if you don't agree with it? Why do people do it? Answer, I don't know. I think it's not a very good idea to be perfectly honest. Dr. Norwood doesn't believe in fenestration and some of the testimony from the other witnesses that's referred to in the brief explains some centers fenestrate, some don't. Some do intracardiac baffle, some do extracardiac. There's four different ways of doing it. If you ask one physician how do they do it, sometimes it's not the same way for every patient and it's not only dependent on age and size of the patient. It's dependent on their own anatomical setup. So answer to your first question is there is no evidence in this record that this patient could have avoided fenestration or have avoided for the rest of her life or even for her first year out of the procedure having fenestration. I'm sorry. Go ahead. So you mean there's no evidence either way? There's no evidence either way. Did the district court err as your opponent says in failing even to recognize that the need for fenestration surgery in and of itself could constitute a harm? No, absolutely not. Judge Surik did what I think was a tremendous job looking at the record, pointing out things that the parties hadn't even raised. For example, raised SIPSA lock orders, raised in a footnote. No party had ever raised that. Plaintiff's counsel had the burden in a motion for summary judgment to say what the damages were. This has been a moving target. The complaint says PLE, that protein problem, and plastic bronchitis, the bronchitis problem. I had a question about where in the complaint is the fenestration harm referred? Not at all. PLE, the protein problem, plastic bronchitis, the bronchitis problem that's related to PLE, and then there's a brain injury asserted, paragraph 54 of the complaint. Along the way of discovery, the brain injury came out of the case. The plaintiff produced an expert report that said PLE, plastic bronchitis, and unforeseen future. And that's what the allegations were when I took the deposition of Dr. Grossfeld. And I asked, not what plaintiff said, that I obscured an issue. I asked, and it's cited at 26A of the appendix from Judge Surik's opinion, do you have any evidence that the complications that plaintiff had in this case were related to CP stent as a device? I don't know. Do you have any scientific evidence that the complication, I made it as broad as I could possibly make because I had gone through PLE and plastic bronchitis and was getting the answers I thought were terrific for me on the motion for summary judgment, and I wanted to make sure I cleaned up everything so we could file a successful motion. So at the time Judge Surik was deciding these motions, the issues he was looking at were PLE and plastic bronchitis. At that point, their expert had agreed these are associated with Fontan physiology unrelated to how you do the surgery. It has to do with the anatomic hookup. And then the third thing was unforeseen future. And Judge Surik correctly decided that there was no expert testimony that any injury was proximately caused by the alleged negligence and that unforeseen future is not cognizable. So Judge Surik did exactly what you would want a district court judge to do, which was read every iota of paper that had been presented to him. And the problem in this case is that even on this appeal, plaintiff continues to add new records and make new arguments about new damages. And hence, we're now talking about fenestration when we don't have a really good developed record on it because it wasn't really a part of the case before the district judge. I'd like to turn for a minute to medical monitoring because there is an issue related in medical monitoring to the physician's side of this as opposed to sort of the toxic tort and product issue. And that is whether a plaintiff had allocated your time. You took six minutes. That time is up. We'll give you one more minute and I'll add another minute of There is no evidence that there is a treatment or a diagnostic study that this patient could have that is or should have or needs or is required by any reasonable physician that is different than what she already has. And so from a physician point of view, looking at this patient, in order to prevail on a medical monitoring claim, should Delaware recognize one, and that's the whole issue Mr. Cregan's going to state that recognizes medical monitoring, says that you need to show by competent, reasonable physician testimony that this patient needs something above and beyond what they already require. It should be an anticipated disease or something that could develop that is being monitored for. Exactly. How else can you assess damages? What is the jury to look at? Should this go to trial without evidence that this patient needs something, A, B, or C, to find something else, disease A, B, or C? How can the jury decide whether the claim is made out or not? There's just no way. You can't just say we have a problem we want to assess for. What is it? And in this particular case where this child has Down syndrome, a heart that is half-functioning, an anatomical setup that took three procedures to do, and will require, it is clear by all experts, by all physicians who've seen her, and including her own treating physician at Children's Hospital of Philadelphia, she will require the same kind of treatment that every other child who has a Fontan completion needs. And there is no evidence in the record from the plaintiff's side about what that is in ordinary cases and how it differs in this case. The most they have is my deposition of Dr. Rychik, the treating physician who said, I do for her what I do for everyone else I see that has this problem. There's an assertion that there will be a, because of the CP stent, there will have to be particular monitoring because she'll outgrow this particular device that wouldn't have occurred had they not, on their own, with no authorization, decided to put an experimental and non-approved piece of hardware into this infant. Is that enough to get them over the hump? First of all, I'm not even certain in the record where it is. It's lawyer arguing. Again, the problem with lawyers who handle medical malpractice cases is sometimes we talk about medicine in ways that aren't supported in the record. These children, first of all, it's only been done for a couple decades. The children who initially had Fontans for this kind of problem are now getting to their 20s and 30s. And they are monitored every year with, you know, whatever they need. And each kid has their own various problems because these heart diseases are fraught with sequelae that occur later on and oftentimes comorbidities, as in this case, Down syndrome is one of the genetic problems. So the answer to your question is, there is no evidence in this record that she needs any additional monitoring than a child with a Fontan completion would need. Her treating physician is the best evidence of that. He's cited in the record. His name is Jack Rychick. We attached, the defendants attached, two pages of his transcript to our motion for reconsideration. It was when we thought maybe Judge Zerk didn't hear the point we were making on medical monitoring because, frankly, it was the tail wagging the dog in this case. And we brought to his attention Jack Rychick's testimony. Dr. Rychick said, I do for her what I do for every other patient I have with Fontan, and that includes A, B, and C. Thank you. Thank you. May it please the court. I'm David Cragen. I represent New Med, but I'm arguing the medical monitoring issue for all of the defendants. Do you want to reserve rebuttal on that issue? Yes, I'd like to reserve a minute. All right. The rule in Delaware is clear. There's no recovery for future harm absent a present physical injury. And the two Supreme Court cases in Delaware that have dealt with claims for future injury, Mergenthaler, which was an asbestos case, and Broska, which was a case involving exposure or alleged exposure to the HIV virus, make that point very clear. And there's no reason to suppose that in a state like Delaware, where the jurisprudence, tort jurisprudence anyway, is restrained, that they'd be inclined to depart from the requirement of a present physical injury to bring a claim for a future harm. Do we need to answer that question if we accept what your colleague just said? That is, if there's no proof that the monitoring would be any different had there been a surgical completion, does it matter whether Delaware would recognize a separate cause of action for medical monitoring? I don't think under the circumstances of this case that it does matter. Certifying the question to the Delaware Supreme Court on this record, I think, would be an exercise in futility. Because there are at least three elements of a separate cause of action for medical monitoring as recognized in those states that do recognize a cause of action. There are at least three elements that plaintiff has been unable and has not proved on summary judgment in the Eastern District of Pennsylvania. In the first case, we're not talking about a proven hazardous substance here. Secondly, as this court discussed in detail just a month ago in the Sheridan v. NGK Metals case, which was a medical monitoring cause case brought for beryllium exposure under Pennsylvania law, plaintiff also has to prove increased risk of contracting an identified latent disease. And she didn't do that at summary judgment either. And then lastly, there's the element that you've already discussed with Ms. Petrosky, and that is you've got to have expert testimony. You have to have a physician-prescribed medical monitoring program, which differs from the medical monitoring that the plaintiff is already receiving or would receive absent exposure. Now, in this case, in response to defendant's request for admission number 24, I think it is, and that's Appendix 553A, 554A, plaintiff admitted that she is already getting medical monitoring at Children's Hospital of Pennsylvania. And you've already discussed with Ms. Petrosky the total lack of evidence in Dr. Grossfeld's report or in his testimony of any prescribed program which differs from what she's already getting or would have gotten had she had the surgical Fontan completion instead of the Fontan completion with the catheter in the stent. So if you felt inclined to blaze new trails in Delaware common law, you should, of course, resist that, certify the question to the Delaware Supreme Court, but why? Completely futile exercise because, on summary judgment, this plaintiff did not and really cannot carry her burden. You moved to strike the deposition testimony of Murphy and Murdison and Rychek, but you, as your colleague just noted, put Rychek testimony in front of the court, and you filed a supplemental appendix containing some of that testimony in sight in your opposition brief. So why should you be heard to complain about it being put before us? Well, I think ultimately, as plaintiff admitted in the briefing, which, quite frankly, I didn't personally participate in, but I believe she's admitted at the end of the day it doesn't really matter anyway. So you're withdrawing your motion? So whether you include the testimony or not. So how about I answer to my question first? So you're withdrawing your motion? Because it doesn't matter and you're about to say that you agree?  So this is a case where I think the facts are so distinct from those in which causes of action for medical monitoring are recognized, or even, as in the case of Delaware, where medical monitoring, as in the Mergenthaler and Broska cases, are potentially an item of damages for an injury caused by a traditional tort. This is a case where you simply do not have the same kind of situation. We're not talking about asbestos or PCBs or lead or beryllium or anything like that. And you can't do an end run around the Federal Food, Drug, and Cosmetic Act either by saying that, well, under NEWMED's plea agreement, it was admitted that the stent was adulterated. Well, that's just an artifact of the statute. By definition, if you violate Section 331A of the FDCA by putting an item into interstate commerce before it has premarket approval from the FDA, that item is by definition adulterated. It says nothing about what we would mean by adulterated in common speak. It doesn't mean that it's defective. It doesn't mean there's anything wrong with it. It just means it didn't have PMA. There's no private cause of action, as everybody knows, under the FDCA, and you can't try to get into the back door with a medical monitoring claim. And the Sutton case, which plaintiff cites from the Sixth Circuit, that was a case that dealt with an allegedly defective medical device. It was an aortic connector. That was a standing case, Article III standing, where the court simply said, well, we're going to let this plaintiff go forward. The court didn't even get to the issue of whether, under Tennessee law, there would be a cause of action for medical monitoring alleging a defective medical device. So the Sutton case doesn't help plaintiffs either. And unlike Friends for All Children, the D.C. Circuit case, we've got no admission of liability here. We have no stipulation of liability, no stipulation to pay for medical monitoring costs. This isn't a case where the doors blew off an airplane, plane crashed, and half of the children on board died. It's not that kind of a case. And New Med's letter and Nemours' letter to the patients recommending medical monitoring doesn't constitute that kind of admission. And as far as I know, there's no such thing as a cause of action by estoppel, certainly not a medical monitoring, a new cause of action by estoppel. So this is not a promissory estoppel case. There's no reliance. In fact, plaintiffs turned down the offer of monitoring made by Nemours. If there are no further questions, I'm out of time. Thank you. Yeah, Ms. Axelrod, I kind of got confused with the appellants on that issue, but we'll give you four minutes of rebuttal and then address medical monitoring. If you need more, we'll consider that. Can I ask you where in the appendix the whole fenestration issue and that harm is alleged, if you know? It's in Dr. Grossfeld's report. No, I mean in the complaint where you allege that as harm that you were asserting. Well, it does talk about needing revision surgery, subsequent surgery in the complaint. With respect to... Do you know where? Well, it's all right. I don't want to take your time. Maybe if you would submit a letter saying where the informed consent slash fenestration as a problem as a result of the lack of informed consent, where that is in the complaint, that would be helpful. I don't think the word fenestration is used, but I do believe revision is used. It does talk about needing subsequent procedures. Let me put a point on it. I would like to know, and maybe you could, if Judge Rendell will allow you to do it, in a supplement, answer with a record cite your opponent's assertion that before Judge Surik was PLE and plastic bronchitis. Fenestration, surgeries to correct with future fenestration, was not in front of him. It wasn't in the complaint. It wasn't otherwise put to the district court. That's something that I think is important for you to give some record attention to. Yeah, I believe it's in our reply brief. Because we go into that when they had said in their brief that it was never even an issue. We cited page after page of our answers to the motion where we talked about the need for additional fenestration procedures and how this child was compelled to go through additional fenestration procedures. And we kept raising it in front of Judge Surik. And then when he came to write the opinion, he just said, well, I think the protein losing enteropathy is an inherent complication and ignored the fenestration procedures altogether. What Judge Jordan asked for, and that would be a letter addressed to the court. Okay. Cite appendix references of where that specifically was raised before him. And as I said, I believe that in my response brief I quoted all those pages. With respect to the harm caused and the future, the medical monitoring. You had testimony from Dr. Cheetham who designed this dent and actually implanted this CP stent in a number of his own patients. That it's the integrity of the stent is an issue and these kids need annual chest x-rays. Because it's metal and only a chest x-ray is going to show if this stent is fractured or broken. And that that's a definite risk. And he has his patients undergo annual chest x-rays. But risks of problems with things. If we held that those were medical monitoring claims, we would be flooding the courts with medical monitoring claims for risks that can happen because of something else. Medical monitoring is really very precise. There is something inherently wrong or toxic or dangerous about something. And you need to monitor it because, not just because you need to keep after it, but because it could give rise to a disease like the beryllium and lead. I mean those things are going to cause a disease. And I don't know how this can be equated to that. Well it can because what came out was that the stent is going to be insufficient to manage this child's blood flow. You had Mr. Tower who was the CEO of Numid, the manufacturer, say the child's heart is going to grow. It's going to need more blood flow through it so the stent is going to have to be re-expanded. But that would be a resulting damage from a successful negligence claim. You know, if they were negligent in putting it in, or if you succeed with your lack of informed consent, then these damages are damages that would be part of that. It doesn't give rise to an independent cause of action, does it? Well, the way I put it is yes, I believe we can recover those as future damages under our lack of informed consent claim, but I also think it supports a medical monitoring claim based on the defendant's own repeated admissions that the stent is going to become insufficient to handle her problems. That's why she's going to need imaging studies. They sent letters to the doctors saying these kids should have annual imaging studies. But you know, if I have a hip put in and it's found to be maybe not up to par, and it's going to be needing some other things later, does that give rise to a medical monitoring claim? I think if you have a defective piece put into your hip, and as a result you know that there are going to be ongoing problems and that you're going to need to have it replaced or fixed at some point, yes, that that would support a medical monitoring claim. You'd concede, wouldn't you, that there's no court that's ever said that before? I mean, that's a completely new spin on medical monitoring, isn't it? Well, you've got the Sutton case talking about people who've had a defective piece put in that gives rise to monitoring. But that is a standing case. Yes, you can bring this. That's all they said. Well, I think it's implicitly recognizing the cause of action. Why would it be any different? In Mergenthaler, you have Delaware Supreme Court cases dealing with asbestos, dealing with water, comparing them to water contamination cases, and saying as long as there's this actual exposure, as in the New Jersey contaminated water case where there's a risk of future harm, then you can have a medical monitoring claim. But the Delaware Supreme Court drew the line in Mergenthaler saying, well, here you just have women who wash their husbands' asbestos-contaminated clothing. There's no showing that they even inhaled the asbestos fibers, no showing that they really could even potentially have harm. In our case, this was implanted. There's no question that this is in her heart, that it's going to become insufficient to manage the flow of her blood, that they're going to need to do monitoring to see when that happens, but they expect it following a period of rapid growth, and that she's going to need cardiac catheterization to expand this dent because she's going to die otherwise. There just won't be enough blood flow going through this kid's heart. So I think that's a very definite and real harm to this child. Let me ask about your motions practice, if I might. I think there was a point where you objected to a supplemental appendix that your opponents were trying to put in, and if I got it right. No, it's the reverse, sir. Well, you had sought to put in a supplemental appendix, but there was also a motion for leave to file some additional materials from your opponent, right? And you said, I think, if I've got it right, well. I did not object to their supplemental appendix, no. So I simply pointed out that how can they be heard to complain because they've included all these additional materials that they now say we shouldn't have included. Okay. I did not move to strike theirs. Your objection, you didn't raise any objection to theirs at all? No. Okay. No, we said this is actually part of the record. These things were filed in the district court. All the depositions were there of record in the district court, and certainly since we're fighting about the expert reports, the experts relied very heavily on all these depositions and referenced them extensively throughout their reports. So we didn't have a problem with it. We just thought they were kind of, you know, trying to have it both ways to include Dr. Murphy's and Reichick's depositions in a supplemental appendix, refer to them extensively in their brief, and then complain if we did something like that. In sum, I believe that there is evidence about both the need for the expansion procedures that they were inherent because of the nature of this dent. It was never meant to be put in the heart in the first place. That's what makes it dangerous and defective because it was never designed to be put in the heart. The designer, in fact, told the doctors at DuPont, I don't think you should do this. It's not FDA approved. It's untested. It's unproven. You don't have your negligence claim on appeal? No. No, it's the lack of informed consent claim. Right. Thank you. Thank you. Thank you very much. Mr. Cregan, did you? I've got one minute. Just one minute? All right. Just one minute. Thank you. Three points. One, no proof the stent is defective. No evidence whatsoever. Two, Dr. Cheatham did indeed testify that the stent could be and would be expanded as a child grew. That was a great advantage. Plaintiffs quote that at length in their briefs about what a wonderful thing that is as opposed to having the surgically completed Fontan where you're stuck with what you put in when you've got a little child. So it's not a defect. That's an advantage. Mergenthaler and Broska, the two Delaware Supreme Court cases, are not about exposure. There's a couple of, I would call them almost secondary holdings there, which are simply tautological. Obviously, if you're not exposed to a toxic substance, then it's unreasonable to claim that you're either injured now or could be injured in the future. That's all they say there. Both of those cases hinge on the absence of any present physical injury. And under those circumstances in Delaware, you could be injured.